## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:18-cr-84 |
| Plaintiff, | : | |
| | : | Judge Matthew W. McFarland |
| v. | : | |
| | : | |
| ZIDKAIJAH WARREN, | : | |
| | : | |
| Defendant. | : | |

---

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (Doc. 38)

---

This case is before the Court on Defendant Zidkaijah Warren's Motion to Suppress (Doc. 38). Mr. Warren is charged with one count of being a felon in possession of a firearm. In his Motion, Mr. Warren argues that the evidence the Government intends to use against him was obtained as a result of an unconstitutional stop and custodial interrogation and must be suppressed. The Government filed a response in opposition (Doc. 40). On July 7, 2021, the Court held a hearing. Thereafter, the parties submitted supplemental post hearing briefs. (*See* Docs. 48 and 49.) This matter is now ripe for review. For the reasons below, Mr. Warren's Motion to Suppress (Doc. 38) is **DENIED**.

### FACTS

On March 12, 2018, Cincinnati 9-1-1 received a call from a victim reporting an attempted armed robbery. (Transcript, Doc. 46, Pg. ID 137-38, lines 25, 1-9.) This attempted robbery occurred on the corner of Gilbert Avenue and Chapel Street in Cincinnati, Ohio. (*Id.* at Pg. ID 140, lines 2-6.) Officers responded to the area based on the

police broadcast of the 9-1-1 call. (*Id.* at Pg. ID 141, lines 8-9.) The caller described the suspected robber as a black male in his twenties, five feet six inches, wearing a green coat with fur around the hood and black pants. (*Id.* at Pg. ID 140, lines 11-16.) Additionally, the caller stated that the suspect had a chrome handgun. (*Id.*) The caller also indicated that the suspect was last seen on foot heading towards McMillan Street on Gilbert Avenue. (*Id.*) The caller left his name and a number to be reached by the police. (*Id.* at Pg. ID 139, lines 17-23.) The police attempted to reach the 9-1-1 caller later in the day but the caller did not answer. (*Id.* at Pg. ID 160, lines 13-24.) The officers never reached the caller. (*Id.* at Pg. ID 160-61, lines 25, 1-2.)

Approximately ten minutes after receiving the broadcast, and twenty minutes since the 9-1-1 call, Officer Manz and Officer Gottmann spotted Mr. Warren on Gilbert Avenue heading towards McMillan Street. (*Id.* at Pg. ID 143, lines 3-10; Pg. ID 158-59, lines 14-16, 13-23.) According to Officer Manz, Mr. Warren, a young black man, was approximately the same height as the 9-1-1 caller described, was wearing a green coat with fur around the hood, black pants, and was in the area at the time the officers were looking for the suspect. (*Id.* at Pg. ID 146, lines 2-15.) Because Mr. Warren was walking outside, in the area and in the direction identified by the caller, and matched the description of the suspect, officers pulled their marked police cruiser alongside Mr. Warren, with the cruiser directed to where Mr. Warren was standing, and exited the car. (*Id.* at Pg. ID 145-46, lines 22-25, 1; Pg. ID 157, lines 9-14.) The officers, who were in uniform, then stopped Mr. Warren. (*Id.* at Pg. ID 145, lines 22-24; Pg. ID 157, lines 5-9.) Upon exiting the police cruiser, Officer Gottmann ordered him to "show us your hands,"

and, when Mr. Warren obeyed, a silver handgun fell out of Mr. Warren's coat. (*Id.* at Pg. ID 147-48, lines 20-21, 2-3.)

The officers then arrested Mr. Warren. (*Id.* at Pg. ID 169, lines 20-22.) While handcuffed, Officer Manz asked Mr. Warren, "What are you doing?" (*Id.* at Pg. ID 149, lines 18-19.) Mr. Warren then told the officers that he had "messed up" and that he had the gun for protection. *(Id.* at Pg. ID 149, lines 20-25.) This interaction occurred before Officer Manz gave Mr. Warren his *Miranda* warnings. (*Id.* at Pg. ID 169-70, lines 25, 1-3.) Immediately thereafter, Officer Manz *Mirandized* Mr. Warren. (*Id.* at Pg. ID 150, lines 13-14). Mr. Warren did not make any statements after being *Mirandized*. (*Id.* at 46, Pg. ID 150, lines 18-24.)

## ANALYSIS

Fourth Amendment protections against unreasonable searches and seizures extend to brief investigatory stops that fall short of traditional arrests. *Terry v. Ohio*, 392 U.S. 1 (1968). Officers are permitted to stop and "briefly detain a person for investigative purposes," so long as the officer has "reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *See Gale v. O'Donohue*, 824 F. App'x 304, 313 (6th Cir. 2020) (cleaned up). The touchstone of the analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Maryland v. Wilson*, 519 U.S. 408, 411 (1997) (*quoting Terry*, 392 U.S. at 19)).

In determining whether "reasonable suspicion" exists, the Court must look at the totality of the circumstances to determine whether the officers had a "particularized and

objective basis" to suspect that the defendant was involved in a crime. *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999). The officers must be able to articulate more than an "inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24 (2000).

In support of his Motion to Suppress, Mr. Warren argues that the officers lacked reasonable suspicion to conduct the stop because it was "premised solely on information provided in a 911 call," that was "uncorroborated and not reasonably trustworthy." (Doc. 38.) He therefore argues that all evidence stemming from the stop must be suppressed, and that his statements to the officer prior to receiving his *Miranda* warning must also be suppressed as violative of his Fifth Amendment rights. The Government contends that there was no stop, and that, if there were a stop, Mr. Warren had no privacy interest in his firearm because it was found on a public sidewalk. Further, the Government contends that the stop was supported by reasonable suspicion. Each of these arguments is discussed in turn below.

## I.     The Officers Did Stop Mr. Warren.

The Supreme Court has held that "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen [. . .]." *Florida v. Royer*, 460 U.S. 491, 497 (1983). In other words, "because a consensual encounter does not amount to a seizure, a police officer does not need reasonable suspicion or probable cause before approaching an individual to make an inquiry." *U.S. v. Campbell*, 486 F.3d 949, 954 (6th Cir. 2007). The

4

dispositive question in this analysis is whether the interaction was "consensual;" that is, based on the police's communication, would a "reasonable person" have believed "that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).

The Government argues that Mr. Warren was not seized because the initial interaction was a consensual encounter. This Court is unpersuaded. Here, the testimony at the hearing revealed that a marked police car drove up to Mr. Warren and was angled directly at Mr. Warren. (Transcript, Doc. 46, Pg. ID 145-46, lines 22-25, 1; Pg. ID 157, lines 9-14.) Upon exiting the vehicle, one officer pointed at Mr. Warren while the other said "Show us your hands." (*Id.* at Pg. ID 147, lines 20-21). A reasonable person in Mr. Warren's position would have believed that he was not at liberty to ignore the officers in question and "go about his business." *See Bostick*, 501 U.S. at 437. Therefore, the interaction does not constitute a consensual encounter but, rather, a stop.

## II.  The Officers Had Reasonable Suspicion to Stop Mr. Warren.

Because this Court finds that the initial interaction constituted a stop, it must determine whether the stop was supported by reasonable suspicion. Here, because the officers were acting on a tip, the Court must determine whether the tip demonstrated "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). The parties point the Court to two Supreme Court decisions, *Florida v. J.L.*, 529 U.S. 266, 270 (2000) and *Navarette v. California*, 572 U.S. 393 (2014), arguing that these decisions are dispositive to the issue at hand. Both of these decisions analyze the existence of reasonable suspicion arising from an anonymous tip.

In this case, however, the tip was not anonymous, as the caller left a name and number. (Transcript, Doc. 46, Pg. ID 139, lines 17-23.) Nonetheless,[1] the question remains the same: did the tip contain sufficient indicia of reliability to provide the officers with reasonable suspicion. Having considered this matter carefully, the Court concludes that the facts of this case more closely resemble *Navarette* and demonstrate that the officers had reasonable suspicion to briefly detain Mr. Warren.

In *Navarette*, an anonymous caller dialed 911 and reported that a Silver Ford 150 pickup truck, license plate number 8–David–94925, ran her off the highway about five minutes prior to the call. 572 U.S. at 395. Police broadcasted the information, and, within twenty minutes, officers pulled the truck over. *Id.* The Supreme Court held that the anonymous call was sufficiently reliable to support the stop for several reasons. First, "[b]y reporting that she had been run off the road by a specific vehicle . . . the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving." *Id.* at 399. Second, there was "reason to think that the 911 caller [] was telling the truth," (*e.g.*, precise location, timelines of events, use of the 911 emergency system, etc.). *Id.* at 399-401. And third, the 911 caller reported "more than a minor traffic infraction and more than a conclusory allegation of drunk or reckless driving. Instead, she alleged a specific and dangerous result of the driver's conduct: running another car off the highway." *Id.* at 403.

Conversely, in *Florida v. J.L.*, an anonymous caller, from an unknown location, reported that a young black male was carrying a gun. 529 U.S. at 268-73. The only other

---

[1] The Supreme Court in *Navarette* recognized that, at the suppression hearing, counsel appeared to agree that the reporting party identified herself in the 911 call recording, although the prosecution and lower courts treated the tip as anonymous. *See Navarette*, 572 U.S. at 398 n.1.

details the caller provided was that the man was standing at a particular bus stop and was wearing a plaid shirt. *Id.* When the officer arrived at the bus stop, the observed three men, one of whom was wearing a plaid shirt. *Id.* Apart from the tip, officers had no reason to suspect any of the three of illegal conduct (*e.g.*, officers did not see a firearm, none of them made any threatening or otherwise unusual movements, etc.). *Id.* The Supreme Court held that this tip failed to provide reasonable suspicion justifying a stop. *Id.* The Court stated that the anonymous call provided nothing more than "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the suspect]." *Id.* at 271. Moreover, the Supreme Court held that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272.

The facts of this case more closely track *Navarette*. Here, the 9-1-1 caller alleged that he had been a victim of armed robbery, a specific and dangerous crime, on the corner of Gilbert Avenue and Chapel Street. (Transcript, Doc. 46, Pg. ID 140, lines 2-6.) Second, the caller provided particularized facts that made it reasonable to believe that he had eyewitness knowledge and was telling the truth. The caller provided the geographic location where the armed robbery occurred, the direction the perpetrator was travelling, and a description of the perpetrator. (*Id.* at Pg. ID 140, lines 2-15.) The caller described a young black male in his twenties, approximately five foot six inches, wearing a green coat with fur around the hood and black pants. (*Id.*) Additionally, the dispatch included that the suspect was on foot walking towards McMillan Street. (*Id.*)

Armed with this information, on Gilbert Avenue right before McMillian Street, Officer Manz observed and stopped Mr. Warren, who was on foot, because "he fit the exact description that was given by the victim in the broadcast by [the] dispatch." (*Id.* at Pg. ID 145-46, lines 20-24, 1.) Mr. Warren is a black male in his twenties and is approximately 5'6". (*Id.* at Pg. ID 146, lines 2-15.) He was also wearing black pants and a green coat with fur around the hood. (*Id.*) Although there were characteristics about him that were not reported in the broadcast, Mr. Warren's description and mode and direction or travel met all of the points conveyed in the broadcast.   And officers cannot assume that broadcasts provide a complete description of every detail, as such descriptions are usually based on statements from victims or witnesses rushed to provide the most pertinent details to officers to locate a suspect. Based on the totality of circumstances, this case resembles *Navarette* and supports a finding of reasonable suspicion.

Thus, at the time the officers approached Mr. Warren, who matched the description given by the caller, they had reasonable suspicion that he was involved in a past crime. Accordingly, they had the "ability to briefly stop that person, ask questions, or check identification" — to investigate their suspicion. *United States v. Hensley*, 469 U.S. 221, 229 (1985).   Here, when the officers ordered Mr. Warren to put his hands up, the firearm at issue dropped from his coat and fell onto the public sidewalk — in plain view. (Transcript, Doc. 46, Pg. ID 148-49, lines 21-25, 1.) Because the stop was supported by reasonable suspicion, the officers were "entitled to seize evidence revealed in plain view in the course of the lawful stop." *Hensley*, 469 U.S. at 234. *See also U.S. v. Britton*, 335 F. App'x. 571, 576 (6th Cir. 2009) (unpublished) (*quoting United States v. Eubanks*, 876 F.2d

8

1514, 1516 (11th Cir.1989)) ("[U]nder the fourth amendment no governmental 'search' occurs if the place or object examined is publicly exposed such that no person can reasonably have an expectation of privacy.").

Accordingly, the officers had reasonable suspicion to approach and stop Mr. Warren, and they were justified in seizing the firearm when it fell onto the public sidewalk in plain view.

### III.    The Challenged Statements Are Admissible.

Based on the above analysis, the statements are not automatically excludable as fruit of the poisonous tree because the stop was supported with reasonable suspicion. However, Mr. Warren separately argues that the statements made after he was arrested but prior to being read his *Miranda* rights should be suppressed because they were made in response to the officer's questions and in violation of Mr. Warren's Fifth Amendment right against compulsory self-incrimination.

A defendant's privilege against compulsory self-incrimination applies only during custodial interrogations. *See Rhode Island v. Innis*, 446 U.S. 291 (1980). A defendant is in custody when he "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). An interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect," *Innis*, 446 U.S. at 301, and "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id*. at 300.

9

Here, although Mr. Warren was in custody when the statements in question were made, as they occurred while Mr. Warren was being handcuffed and placed under arrest, he was not being interrogated. Rather, the record reflects only that Officer Manz asked Mr. Warren what he was doing upon being arrested. (Transcript, Doc. 46, Pg. ID 149, lines 18-19.) The question, taken in context, is more akin to a rhetorical question, like "what were you thinking"—than an actual question. Indeed, these words are more akin to words that are normally attendant to an arrest. And Officer Manz did not repeat the question or otherwise demand an answer. Rather, Mr. Warren immediately admitted he "messed up" and then continued to explain why he had the gun in question, stating he has it for protection. (*Id.* at Pg. ID 149, lines 20-25.) Officer Manz's single question does not equate to words or actions that an officer should know would reasonably elicit an incriminating response. Therefore, Officer Manz's single question does not constitute a custodial interrogation, and so Mr. Warren's statements are admissible.

## CONCLUSION

In short, the 9-1-1 call that prompted Officer Manz and Officer Gottman to stop Mr. Warren contained sufficient information for the officers to create a particularized and objective basis that Mr. Warren had recently committed a crime. The totality of the circumstances establish that the officers had reasonable suspicion to stop Mr. Warren. Additionally, Officer Manz's conduct upon arresting Mr. Warren did not constitute a custodial interrogation. Accordingly, Mr. Warren's Motion to Suppress (Doc. 38) is hereby **DENIED**.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND